Opinion issued July 9, 2026



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00332-CR

———————————

**MATTHEW HABERLAND, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 339th District Court**
**Harris County, Texas**
**Trial Court Case No. 1775726**

---

## MEMORANDUM OPINION

A jury found Mathew Haberland guilty of murdering his long-term romantic partner, Ashley Wallace, by shooting her in the face with a shotgun. After finding him guilty, the jury assessed Haberland's punishment at 45 years of confinement.

Haberland raises two issues on appeal. He argues the trial court erred in denying his motion for directed verdict. Haberland also argues the evidence is legally insufficient to support the jury's finding that he murdered Wallace, asserting that there is no indication that her "death was anything other than a suicide."

Under settled law, both of Haberland's issues challenge the legal sufficiency of the evidence. Viewing the evidence in the light most favorable to the jury's verdict, as we must, we hold the jury could have reasonably found beyond a reasonable doubt that Wallace was murdered and that Haberland was the person who murdered her. Thus, the evidence legally suffices, and we affirm his conviction.

**BACKGROUND**

On the night of June 21, 2022, Wallace and her three children—13-year-old Cameron and two toddlers—went to sleep around 11:00 p.m. Sometime between then and 8:30 a.m. the next morning, Wallace died from a single shotgun blast to the face. A grand jury indicted Matthew Haberland—the boyfriend with whom she resided and father of her two younger children—for murder. *See* TEX. PENAL CODE § 19.02(b)(1), (2) (person commits murder if he "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual").

Haberland pleaded "not guilty." The case then went to trial before a jury.

2

The jury heard evidence that when Wallace and her children went to bed the night before she was found dead, Haberman had not returned home. The trial record is silent as to whether he came home that night or during the early morning hours.

Shortly after 8:30 a.m. the next morning, Cameron called for emergency assistance, and Haberman took charge of the call. Haberman reported that he had come home from work and found Wallace slumped over on the couch with "blood everywhere." Haberman said he could not tell where the blood was coming from but told the 911 dispatcher, "I think she's dead." Later comments he made on the call implicitly asserted that Wallace had committed suicide. Haberman asked aloud what Wallace had done and how she could do "this," without any further elaboration.

First responders arrived not long afterward. A. Ervin, the Houston firefighter and paramedic who evaluated Wallace had to push her into an upright, sitting position to do so. The shotgun wound to her face was not visible beforehand. Ervin said it then became apparent that she was dead and had been dead for some time.

A shotgun lay on an adjacent couch, partially under throw pillows. Multiple witnesses, including Ervin, testified that its location was inconsistent with suicide. E. May, one of the detectives who investigated this case, explained that the shotgun was out of Wallace's reach and could not have ended up where it was from recoil.

Haberland told one peace officer who responded to the scene—M. Lerch— that he had run out of gas on the way to work that morning and came home afterward.

3

Haberland had told Brad Florian, the person for whom he was supposed to work that day, the same thing. Florian testified that he lent his truck and a gas can to Haberland to refuel his own vehicle and retrieve an air hose. But Haberland instead drove home, where he ostensibly found Wallace dead.

Haberland also informed Officer Lerch that he had left his keys, including his housekey, in his own vehicle when he ran out of gas. Having left his keys behind, Haberland explained, he then had to kick in the front door to gain entry to his home when he returned and heard the two younger children inside crying. But the condition of the front door did not seem to support this explanation. For example, as Detective May stated on the stand, the doorjamb or doorframe remained intact.

While peace officers secured the scene, Haberland, the children, and several other family members (who had since arrived) waited in the yard, unable to go inside the home due to the ongoing investigation. Haberland told another peace officer, M. Pesses, that he was going to go around the side of the house to urinate. Instead, Haberland left the property.

Once officers at the scene became aware that Haberland had left without informing anyone of his departure, they notified other officers, who began looking for him. Eventually, R. Salve Ramirez, Jr. and his partner, both of whom were patrolling on bicycles, spotted Haberland walking on a nearby woodland trail.

4

When Haberland saw Ramirez and his partner approaching on their bikes, Haberland veered off the trail into the woods, returning to the trail only after the officers asked him to do so. When the officers said they wanted to ask Haberland about a nearby "scene," Haberland acted as if he had no idea what they were talking about, replying "Scene?" Haberland also initially gave them a false name. After he later admitted his identity, he claimed he was trying to return to work (even though Florian's truck was still at his home). The two officers took him back to the scene.

There was one other notable aspect about Haberland's departure. Before he left the scene, he was wearing two t-shirts, one over another. When the bike officers found him on the woodland trail, Haberland was only wearing the second one, the t-shirt that he originally wore beneath the other. Sometime in the interim, Haberland had removed and discarded the other t-shirt. At trial, Detective May testified that in his experience, people sometimes change clothes to hide evidence and that he believed that is what Haberland was trying to do by discarding the one t-shirt. May further testified that he searched for the discarded t-shirt but was unable to find it.

J. Ross, the assistant medical examiner who conducted the autopsy of Wallace's body, concluded that Wallace died as a result of homicide, not suicide. She based this conclusion primarily on the nature of the wound, which showed the shotgun had to have been at a distance of somewhere between eight inches and two-

and-a-half feet from Wallace's face when it was fired—a range that made it improbable for a woman of Wallace's height and reach to have shot herself.

As for Haberland's motive, the prosecution called her son, Cameron, and Wallace's sister, Crystal, as witnesses. Both Cameron and Crystal testified that the relationship between Wallace and Haberland had become acrimonious, and she planned to leave him. Cameron said Wallace and Haberland argued many times per day in the days before her death.

Cameron and Crystal also testified that Wallace was not suicidal.

Apart from Haberland's purported forced entry, there was no evidence that anyone had broken into the home. Nor was there evidence of burglary. So, if Wallace was murdered, it seemed that someone with access to the home took her life.

To be sure, the defense hotly contested the conclusion that Wallace was murdered. The defense tried to show, albeit with little success, that first responders or peace officers had contaminated the scene by moving the shotgun to the location where it ostensibly was found in a way that only made suicide seem improbable. The defense also put on its own expert witness who contested the assistant medical examiner's conclusion that Wallace's death was a homicide on various grounds.

The defense further contended that even if it was a homicide, no physical evidence—DNA, fingerprints, blood spatter—connected Haberman to the crime. The defense acknowledged that Haberman had behaved oddly at the scene but

contended that he did so because he was grief-stricken, not because he was guilty. It also pointed to Cameron as an alternative suspect who also was inside the home.

The jury sided with the prosecution, finding Haberman guilty as charged and assessing his punishment at 45 years' confinement. Haberman now appeals.

## DISCUSSION

### Standard of Review

In reviewing a jury's verdict for evidentiary sufficiency, we must uphold its verdict if any rational trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt. *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021). The jury's verdict is irrational under this standard only if it is based on evidence that is not legally sufficient to support a conviction. *Id.* at 655–56; *see Cary v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016) (stating appellate court's role is not to act as thirteenth juror but rather is confined to ensuring jury's verdict is rational one that is based on more than mere modicum of evidence).

In a legal-sufficiency review, we consider all the admitted evidence and view it in the light most favorable to the verdict. *Harrell v. State*, 620 S.W.3d 910, 913–14 (Tex. Crim. App. 2021). This standard recognizes it is the jury's prerogative to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* at 914. So, we must defer to the

jury's evaluation of the credibility of the witnesses and the weight to be given to various evidence. *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021).

An inference is a conclusion reached by considering other facts and deducing a logical consequence from them. *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013). The jury may draw inferences from the evidence so long as the evidence supports each inference. *Carter v. State*, 620 S.W.3d 147, 150 (Tex. Crim. App. 2021). When the evidence supports reasonable but conflicting inferences, we presume the jury resolved the conflict in favor of its verdict, and we defer to the jury's resolution of the conflicting inferences. *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023). The jury is entitled to this deference because it may rely on common sense, common knowledge, personal experience, and observations from life when drawing inferences from the evidence. *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023). However, the jury's verdict cannot rest on conjecture or speculation, which are mere theorizing or guessing about the possible meaning of the facts and evidence presented, as opposed to reasonable inferences that can be drawn from the evidence admitted at trial. *Anderson*, 416 S.W.3d at 888.

Each fact need not point directly and independently to guilt, so long as the cumulative force of all the incriminating circumstances suffices to support the jury's verdict. *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020). Thus, in our review, we must not use a divide-and-conquer strategy, evaluating individual bits of

evidence in isolation, because this approach does not consider the cumulative force of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Nor does the evidence need to negate every conceivable alternative to the defendant's guilt to be sufficient. *David v. State*, 663 S.W.3d 673, 678 (Tex. Crim. App. 2022).

The law does not require a particular type of evidence. *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018). Direct and circumstantial evidence are equally probative. *Id.* Circumstantial evidence alone can be legally sufficient. *Id.* We apply the same standard of review with respect to both direct and circumstantial evidence. *Hammack v. State*, 622 S.W.3d 910, 915 (Tex. Crim. App. 2021).

Finally, we reiterate that legal-sufficiency review turns on the evidence the jury saw and heard. *Harrell*, 620 S.W.3d at 913–14. Evidence that conceivably could have been admitted, but was not, does not impact the sufficiency of the evidence that was admitted. *See Murray*, 457 S.W.3d at 449–50 (holding lower appellate court erred in focusing on evidence that was not admitted at trial in its legal-sufficiency review). Nor do we compare the record in this case with the records in others to ensure that particular evidence admitted in other trials is not missing. *Id.*; *Ledford v. State*, 649 S.W.3d 731, 742 (Tex. App.—Houston [1st Dist.] 2022, no pet.).

**Analysis**

On appeal, Haberland raises two issues: he argues that the trial court erred in denying his motion for directed verdict and that the evidence is legally insufficient

9

to support his conviction. As these are both legal-sufficiency challenges, we review them together. *See Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996) (appellate court treats complaint about denial of motion for directed verdict as legal-sufficiency challenge to evidence); *Costilla v. State*, 650 S.W.3d 201, 212 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (citing *Williams* for same proposition).

Haberland asserts the evidence is legally insufficient in two ways. First, he says the evidence is insufficient to show that anyone murdered Wallace, arguing there is no evidence indicating that her "death was anything other than a suicide." Second, Haberland says that even if one assumes Wallace was murdered, the evidence is insufficient to show that Haberland was the one who murdered her.

In every prosecution, the State must prove that the accused is the one who committed the charged crime. *Phillips v. State*, 534 S.W.3d 644, 651 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Both of Haberland's legal-sufficiency arguments contest this element of the crime—the identity of the person who killed Wallace. *See id.* (describing issue of who committed crime as one of identity); *Jones v. State*, 458 S.W.3d 625, 630 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (saying same thing in context of a murder prosecution); *see also Ortiz v. State*, 93 S.W.3d 79, 92 (Tex. Crim. App. 2002) (defense theory of suicide was aimed at negating element of prosecution's case, specifically, whether accused killed the deceased as alleged).

**A.    The evidence is legally sufficient to show that Wallace was murdered.**

**1.    Based on the evidence, the jury could have reasonably found that the location of the shotgun was inconsistent with suicide.**

The location of the shotgun when first responders and peace officers arrived at the scene of the shooting played a key role in the investigation. Multiple witnesses testified that its location on an adjacent couch, partially under some throw pillows, was inconsistent with suicide, including: Ervin, the paramedic who determined that Wallace was deceased; and Lerch, one of the first officers on the scene. As Detective May explained, this circumstance was significant because it was outside of Wallace's reach and the recoil from firing it would not account for its location.

At trial, the defense suggested that first responders or peace officers placed the shotgun where it was said to have been found. But Ervin and Lerch, the two trial witnesses who were among the first to arrive at the scene, were both asked about this, and they stated they neither moved the shotgun nor saw anyone else do so.

The lone witness who testified differently was A. Lehosky, the crime scene investigator, who arrived there after Ervin, Lerch, and homicide detectives were on site. Based on crime scene photographs she took, Lehosky initially testified that it looked like the shotgun had been moved. But she later agreed that she could not say for certain due to shadows and differing perspectives in the photographs.[1]

---

[1]    In his brief, Haberland notes that Officer Lerch testified that he assumed that crime scene investigators moved the shotgun. But it is undisputed that one of the crime scene

11

The only other suggestion that the shotgun was moved arose during Detective May's testimony. May was questioned about a statement his partner (who was not called as a witness at trial) made at the scene about the shotgun having been moved by paramedics. But May stated his partner was just speculating, and May disagreed with this speculation, testifying: "I don't believe the gun was ever moved."[2]

## 2. The medical examiner concluded that this was a homicide, and the jury could have reasonably credited this conclusion.

J. Ross, the assistant medical examiner who performed the autopsy in this case, found that Wallace's manner of death was homicide, rather than a suicide. In essence, she concluded that it was unlikely that a person of Wallace's size and reach could have shot herself, given the evidence that she was not shot at close range.

Ross opined that the shotgun was somewhere between eight inches and two-and-a-half feet away from Wallace's face when it was fired. She based this conclusion on: the nature of the gunpowder stippling and lacerations on Wallace's

---

investigators, Lehosky, did so—when she collected the shotgun as evidence. Lehosky denied moving the shotgun other than to collect it as evidence after she had processed the scene. Taken together, Lerch's and Lehosky's testimony does not suggest that the shotgun was moved at a time or in a way that calls into question the accuracy or integrity of the investigation—or so the jury, whose role it was to evaluate the evidence, could have reasonably found.

[2] In addition to suggesting that first responders or peace officers may have moved the shotgun to the location where it was found, the defense put an expert on the stand who opined that the shotgun could have ended up there due to recoil (if Wallace shot herself). Haberland makes no reference to this opinion testimony in his brief. In any event, Detective May testified that recoil could not account for where the shotgun was found, and evidentiary conflicts, like this one, were for the jury to resolve.

face, which showed the shotgun was neither in physical contact with nor within half a foot of her face when fired; the absence of soot on Wallace's face, which one would expect to find there if the shotgun was fired within eight inches of it; and the existence of a single entrance wound (rather than multiple entry wounds from scattered birdshot), which meant the shotgun had to have been within two-and-a-half feet of her face when fired according to the literature on shotgun wounds. Based on these circumstances and Wallace's size and reach, Ross concluded that her manner of death was homicide, as "it would be difficult to hold a gun and hold it that far away from yourself and fire it and get that same sort of wound pattern."

Ross also noted that, in contrast, when a person commits suicide with a firearm, she typically presses it to her skin, which leaves a distinct mark. Whereas, the wound sustained by Wallace did not demonstrate this kind of close contact.

On cross-examination, Ross conceded that one particle of gunshot residue was found on Wallace's left hand, and that one possible explanation for its presence there was that she had fired the shotgun. But as stated in a supplemental gunshot residue report appended to Ross's autopsy report, the presence of this particle was consistent with multiple possibilities, including being near enough to the shotgun when it was fired (as Wallace would have been here whether she or another fired it).

In this regard, Ross's autopsy report and its supplement were corroborated by the testimony of J. Schroeder, the prosecution's expert witness on gunshot residue.

13

He testified that the mere presence (or absence) of gunshot residue is not itself informative and cannot be used to positively identify the shooter of a firearm.

Ross also conceded on cross-examination that she measured Wallace's reach based on her right arm, rather than her left—the one with the gunshot residue. But she explained that she did not think the two measurements would differ much.

Ross agreed that she could not testify that it was impossible for Wallace to have shot herself; suicide was possible. But she did not retract her conclusion that, based on the evidence, Wallace's manner of death was homicide, not suicide.

### 3. Though a defense expert disputed the assistant medical examiner's conclusion that Wallace's death was a homicide, rather than a suicide, the jury was entitled to disregard this expert's opinion.

John Laughlin, who has a master's degree in bioengineering and is a biomedical and mechanical engineer, testified as an expert for the defense.[3] He disputed the assistant medical examiner's conclusion that Wallace's death was a

---

[3] Laughlin has previously testified as an expert on accident reconstruction and human factors in car-accident cases. By his own admission, he is not an expert on gunshot residue, ballistics, or blood spatter. Yet, Laughlin's testimony touched on these subjects at trial; he purported to be able to do so based on his knowledge of physics. Whether he was qualified to testify as an expert in this case is not before us on appeal. But our discussion of his testimony should not be construed as an approval of engineers as all-purpose experts. *See Rhomer v. State*, 569 S.W.3d 664, 670 (Tex. Crim. App. 2019) ("Fit is a component of qualification, and the expert's background must be tailored to the specific area of expertise in which the expert desires to testify.") (internal quotation marks omitted).

homicide, opining, among other things, that the shotgun was fired closer to Wallace's face than asserted and she was not in a defensive posture when shot.

But the jury was not required to credit Laughlin's opinions over those of Ross, the assistant medical examiner who autopsied Wallace's body. *See Jones v. State*, 235 S.W.3d 783, 786 (Tex. Crim. App. 2007) ("The jury, as the fact finder, was free to believe or disbelieve, in whole or in part, either or both of the experts."). Here, the jury heard contradictory conclusions from two experts, each of whom explained the bases for their opinions on the stand. Like any other conflict in the evidence, it was the jury's role to resolve this one. *See id.*; *see also Harrell*, 620 S.W.3d at 914.

### 4. The jury could have reasonably found that other circumstances— use of a shotgun, location of the wound, and condition of the shotgun—are atypical for suicide.

The jury heard evidence that the use of a shotgun itself is not necessarily a common means of committing suicide. Ross testified that she has ruled about 1,600 deaths as suicides after conducting an autopsy. In her experience as an assistant medical examiner, suicide by shotgun is not as common as suicide by handgun.

In addition, the jury heard evidence that the location of Wallace's wound is atypical for suicide. The autopsy report states Wallace sustained a single "penetrating shotgun wound" that was "centered between the eyebrows on the forehead." And photographs accompanying the report corroborate this description. Ross testified that she had never seen an instance of suicide by shotgun involving a

15

facial wound like this one. Similarly, Detective May, who had seen suicides by shotgun in the past, said he had not seen one with a forehead wound.

Finally, the jury heard evidence that the condition of the shotgun was atypical for suicide. Specifically no blood spatter was on the shotgun. May stated that in the suicides he has investigated, there "typically" is blood spatter on the firearm.

### 5. Based on the evidence it heard, the jury could have reasonably found that Wallace was not suicidal and had no history of past attempts.

Two witnesses testified about Wallace's state of mind in the period immediately prior to her death: Crystal, her sister; and Cameron, her son, who was 13 years old at the time of his mother's death. Both acknowledged that Wallace's relationship with Haberland had soured and was a source of friction and unhappiness in the home. But both witnesses testified that she was not depressed or suicidal.

Crystal last saw Wallace about three or four days before her death. She testified that Wallace was not severely depressed despite the relationship problems. Wallace had not expressed a desire to kill herself, and she had no prior history of suicide attempts. Wallace had three children, two of whom were very young, and she enjoyed being a mom. During their last visit, Crystal and Wallace had made plans for the near future—to get pool passes to use the neighborhood pools.

16

Cameron testified that he had a close relationship with his mom. Apart from the arguments and discord between her and Haberland, Cameron described his mother as being a happy person in general, even in the period before her death.

\* \* \*

Considering the cumulative force of all the evidence that the jury heard about Wallace's death, and viewing the evidence in the light most favorable to the jury's verdict, as we must, the jury could have reasonably found beyond a reasonable doubt that Wallace did not kill herself and that she therefore was murdered by someone.

**B.    The evidence is legally sufficient to show Haberland is the murderer.**

**1.    The jury could have reasonably found from the uncontradicted evidence it heard about the acrimonious end of the romantic relationship between Wallace and Haberland that he had a motive to murder her.**

Motive, standing alone, is not evidence of murder. *Hacker v. State*, 389 S.W.3d 860, 870–71 (Tex. Crim. App. 2013); *see also Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (motive alone not sufficient to prove identity). But motive is a significant circumstance indicative of guilt, and evidence of motive may link the accused to the crime charged or support other evidence indicative of the accused's guilt as to the crime charged. *See Hacker*, 389 S.W.3d at 870–71.

Wallace and Haberland shared a home and were long-term romantic partners. They had two young children together and were raising a third, Cameron, who was

17

her son from a prior union. Their relationship was akin to a marriage, and, according to uncontradicted trial testimony, it was now coming to an end.

Wallace's sister, Crystal, testified that the relationship was not good during the six months preceding Wallace's death. Wallace intended to leave Haberland, and her resolve to leave stiffened in the two weeks before the fatal shooting.

Wallace's son, Cameron, likewise testified that his mother intended to leave Haberland. Cameron, who lived in the home with Wallace and Haberland, stated that in the month before her death, she and Haberland argued noticeably more—multiple times per day. Cameron testified that he did not witness a single happy moment between his mother and Haberland during their final month together.

Evidence of this kind of acrimony and difficulty in the context of a romantic relationship can establish a motive for murder. *See Nisbett v. State*, 552 S.W.3d 244, 265 (Tex. Crim. App. 2018) ("Marital difficulty can establish a motive for murder."); *Ingerson v. State*, 559 S.W.3d 501, 510 (Tex. Crim. App. 2018) (accused's anger at woman he was romantically interested in showed motive for him to murder her). So, the jury could have reasonably found Haberland had a motive to murder Wallace.

2. **The jury could have reasonably found Haberland's account of his ostensible discovery of Wallace's body to be inconsistent with some of the evidence it heard.**

Haberland did not testify at trial but his 911 call was played for the jury. The call was placed a little after 8:30 a.m. Haberland reported that he thought Wallace

18

was "dead" because she was slumped over on the couch and there was "blood everywhere." He said he did not know from where on her body the blood was coming. Haberland also said he did not know what had happened, explaining that had just returned home from work and found her in this condition. Despite saying he did not know what had happened, he can be heard on the recording asking aloud what Wallace had done and later how she could do "this" without elaboration.

More than once, the 911 dispatcher proposed that Haberland begin cardiopulmonary resuscitation on Wallace, offering to instruct him how to do so. Haberland declined, explaining, in effect, that he was too distraught to give aid.

Florian, for whom Haberland was scheduled to work on the day of the shooting, testified at trial. When Florian arrived at his place of business (sometime after 7:30 a.m.), Haberland was already there and told Florian that he had run out of gas on the way to work and walked the rest of the way—a half mile—there. Florian gave Haberland a gas can with about a gallon of gas in it. Florian also lent his truck to Haberland to go to Florian's home to pick up an air hose and then to go to a gas station to buy additional gas to fill up Haberland's vehicle. Haberland then left to do these things sometime between 8:00 a.m. and 8:15 a.m., according to Florian.

Florian and Haberland did not discuss Haberland returning to his own home at any point in this process for any reason. Yet, that is what Haberland did—return to his home instead, at which point he claimed he discovered Wallace's body.

After the arrival of first responders and peace officers who were dispatched to the scene as a result of the 911 call, Officer Lerch briefly spoke with Haberland. Lerch testified that Haberland said he ran out of gas on the way to work and subsequently returned home. When Haberland returned, he could hear his children crying inside, but he was unable to immediately get inside because he had left his keys in his vehicle. So he kicked in the front door to gain entry to the home.

Several photographs of the door were admitted into evidence. And while the door does exhibit some damage in some of the photos, the testimony at trial about the extent of the damage was mixed at best. Lerch stated that while damage to the door was consistent with Haberland's claim to have forced entry, he could not say whether the damage genuinely reflected that the door had been kicked in. Unlike Lerch, Detective May was unequivocal, testifying: "There was no indication of any forced entry on the doors." In his view, the photos did not show major damage. And though there was some damage to the door, the doorjamb remained intact.

Viewing this evidence as a whole, the jury could have reasonably found Haberland's version of events was inconsistent enough with other evidence that it heard to show consciousness of guilt on Haberland's part for Wallace's death. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("implausible explanations to the police" are "probative of wrongful conduct"); *see also Gear v.*

*State*, 340 S.W.3d 743, 747 (Tex. Crim. App. 2011) (jury can consider the defendant's untruthful statements as affirmative evidence of guilt for crime).

In sum, Haberland did not claim to know for certain that Wallace was dead or even to understand where she was injured but declined to try to give her aid even when offered assistance. Despite saying he did not see her injury, Haberland twice insinuated that Wallace had taken her own life—a position the assistant medical examiner and homicide detectives later rejected as inconsistent with the evidence.

No evidence in the record explains why Haberland returned home that morning,[4] an act that gave him the opportunity to discover and report Wallace's death to the authorities in a way the implicitly denied he had been there beforehand but was inconsistent with the plan of action he and Florian had discussed that morning. Haberland asserted he had to kick the door in to make this discovery because he had—for an unexplained reason—left his keys, including his housekey, in his vehicle after it ran out of gas. But the doorframe remained intact afterward.

To be sure, these circumstances—however inconsistent they are in the aggregate—do not to prove Haberland's guilt. But they are circumstances that the

---

[4]  The record does not establish whether Haberland was at home before he went to work that morning. Cameron testified that Haberland had not yet returned home the previous evening when the remainder of the household—he, his mother, and his siblings—went to bed around 11:00 p.m. Cameron did not see Haberland again until the following morning, when Haberland returned to the house from work.

jury was entitled to consider in combination with other evidence in finding him guilty. *See Guevara*, 152 S.W.3d at 50; *see also Gear*, 340 S.W.3d at 747.

**3.    The jury could have reasonably found that Haberland fled from the scene of Wallace's death while it was being investigated and that the circumstances exhibited a consciousness of guilt.**

At trial, the jury heard uncontradicted testimony that Haberland fled from Wallace and Haberland's shared home while peace officers were there investigating Wallace's death. Flight, of course, is evidence from which a jury can reasonably infer guilt. *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007).

On appeal, as at trial, Haberland does not dispute that he left the scene, but he claims that doing so was not flight, as peace officers had neither detained nor arrested him. Because he remained free to leave as a matter of law, Haberland asserts there was nothing suspicious about his departure. But a person need not commit the separate crime of evading detention or arrest in order for his departure to be suspicious or constitute evidence of consciousness of guilt on his part. *See id.* (defendant's flight from scene without peace officers present was "an additional piece of incriminating circumstantial evidence" under facts of case); *see also Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex. Crim. App. 2011) (fact that defendant seemed to be in rush to leave scene when another person arrived was inculpatory). The question is whether the departure was indicative of guilt under the circumstances. Here, the jury could have reasonably found Haberland's sudden

22

departure from the scene—leaving his children behind at the scene of their mother's death in the process—to be evidence of his consciousness of his own guilt.

Officer Pesses testified that Haberland told him that was going to step around the side of the house to urinate (as no one was allowed in the house due to the investigation) but then left the scene instead. Pesses only discovered this afterward when he went to check on Haberland's whereabouts. About Haberland's sudden departure, Pesses stated: "most people don't run." And the jury could have agreed and reasonably found that Haberland's departure by deceit was indicative of guilt. *See Amador v. State*, 275 S.W.3d 872, 879 (Tex. Crim. App. 2009) (lie defendant told trooper suggested not only attempt to deceive but also consciousness of guilt).

Nor did Haberland return to the scene of his own volition. Bicycle patrol officers later found him on a nearby woodland trail. Officer Ramirez testified that when he and his partner (Sgt. E. Schmidt) came across Haberland, Haberland immediately left the trail, walking into the woods and away from the officers, which seemed odd to Ramirez. After Ramirez's partner asked Haberland to return to the trail to speak with them about a nearby "scene around the corner," Haberland behaved as if he did not know what they were talking about, replying, "Scene?"

Haberland initially gave the bike patrol officers a false name when asked to identify himself ("King James"), which is another act exhibiting consciousness of guilt. *See State v. Cruz*, 461 S.W.3d 531, 539 (Tex. Crim. App. 2015) (giving false

23

name to police shows consciousness of guilt). And, after he later gave his true name, Haberland told the officers that he was trying to return to work—a story the jury could have reasonably found to be both improbable (if for no other reason than because Florian's truck, which Haberland had borrowed, was at the scene) and inconsistent with his previously stated intention of going around the side of his house to urinate. *See Guevara*, 152 S.W.3d at 50 (stating "implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt").

4. **The jury could have reasonably found that, after fleeing the scene, Haberland disposed of evidence—one of the t-shirts he had been wearing—that was relevant to the investigation.**

When Haberland left the scene under false pretenses, he had been wearing two t-shirts, one atop another. But when the bike patrol officers found Haberland, he was wearing a single t-shirt—the one he had been wearing underneath the second one. Detective May testified that people sometimes change clothes to try to hide evidence of their guilt, and he concluded that is what Haberland did by discarding the t-shirt. May searched for the discarded t-shirt, but he was unable to find it.

Under the circumstances, the jury could have reasonably found that Haberland disposed of evidence that he believed might otherwise incriminate him, which is another circumstance indicative of guilt. *See id.* (stating an attempt "to conceal incriminating evidence" is indicative of wrongdoing and guilt); *accord Hammack*, 622 S.W.3d at 918 n.33.

The defense insisted that Haberland may have simply removed his outer t-shirt because it was June in Houston. Detective May conceded this was not "outside the realm of possibility." But May did not believe this to be the case, testifying that he thought Haberland took off the t-shirt to dispose of evidence. The resolution of factual disputes, like this one, was the prerogative of the jury, which may have reasonably found that the summer heat and humidity could not account for Haberland's disposal of the t-shirt, even if it could account for Haberland taking it off. *See Harrell*, 620 S.W.3d at 914 (jury resolves testimonial conflicts, weighs the evidence, and draw reasonable inferences from basic facts to ultimate facts).

5. **Haberland is correct that no physical evidence directly links him to Wallace's murder; however, the law does not require physical evidence, and the jury could have reasonably discounted its absence.**

On appeal, as below, Haberland notes that no physical evidence—DNA, fingerprints, or blood spatter—links him to Wallace's death. This is true but does not render the evidence of his guilt legally insufficient for two independent reasons.

First, as a matter of law, direct physical evidence linking the accused to the crime charged is not necessary to support a conviction. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016) (identity and criminal culpability may be proved through circumstantial evidence, and reasonable inferences drawn therefrom, alone, so that "lack of direct evidence is not dispositive of the issue of guilt"); *see also Delacerda v. State*, 425 S.W.3d 367, 382 (Tex. App.—Houston [1st Dist.] 2011,

25

pet. ref'd) ("Sufficient evidence can support a murder conviction even in the absence of physical evidence such as DNA evidence, fingerprinting evidence, and the murder weapon; thus, such evidence is not required to obtain a conviction."). While the jury was free to consider the absence of such evidence, it does not detract from the legal sufficiency of the evidence the jury did hear. *See Jenkins*, 493 S.W.3d at 599.

Second, it was undisputed that Haberland was at the scene before first responders and peace officers arrived there. While he asserted in the 911 call and at the scene that he unexpectedly happened upon Wallace deceased, the jury was free to disbelieve him. *See Martin*, 635 S.W.3d at 679 (jury evaluates witness credibility and what weight is to be given to various evidence and we defer to its evaluation). If so, the jury could have reasonably found—consistent with undisputed evidence that Wallace had been dead for some time[5]—that Haberland killed her at some earlier point in time and thus had the opportunity to dispose of physical evidence. *See, e.g.*, *Temple v. State*, 729 S.W.3d 793, 814 (Tex. App.—[14th Dist.] 2025, pet. ref'd) (noting that, depending on facts jury chose to credit, jury could have found defendant had ample time to stage scene).

In addition, as we have discussed, the jury heard evidence of one explicit instance that it could have reasonably understood as a successful attempt to dispose

---

[5] Ervin, the paramedic who first determined that Wallace was deceased, testified that there was "no active bleeding," so she "had been there for a while."

of potentially incriminating evidence—Haberland's removal and discarding of one of the two t-shirts he was wearing. Under these circumstances, the jury may have reasonably attributed the lack of direct physical evidence—like DNA, fingerprints, or blood spatter—linking him to the crime to his successful efforts at concealment, rather than seeing this as an indicator that he played no role in Wallace's death.

**6. Based on the evidence it heard, the jury could have reasonably deduced that Haberman murdered Wallace.**

Detective May testified that there was no evidence of an intrusion into the home by an unknown party, such as evidence of forced entry, disorder resulting from a search for valuables, or missing valuables. The defense's theory of the case at trial was consistent with May's testimony in this respect. Haberland primarily asserted that Wallace had committed suicide, and he told Officer Lerch that he had to force the front door open by kicking it in order to gain entry into the home.

In short, no one contended that anyone outside the home played a role in Wallace's death, and there was no evidence that anyone outside the home did so. Consequently, once the jury found the evidence showed that Wallace was murdered by someone, the jury could have reasonably deduced that this someone had to be one of the residents of the home. *See Dawkins v. State*, 495 S.W.3d 890, 896 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (no direct physical evidence linked defendant to murder, but circumstances—including lack of forced entry—allowed jury to reasonably find that victim was murdered by someone who knew her).

27

Apart from Haberland, the only other possible perpetrator with access to the home was Wallace's then 13-year-old son, Cameron. The defense suggested him as an alternative suspect, noting that though Cameron slept not far from where his mom's body was found, he had not heard the shotgun blast, waking to find his mom motionless only after hearing Haberland repeatedly yelling, "Oh my God!"

But May testified that there was no evidence that would suggest Cameron had anything to do with his mom's death. Cameron's behavior was not suspicious.

In addition, the jury heard uncontradicted evidence that Cameron and his mom were close to one another and had a good relationship. Thus, unlike Haberman, there was no evidence that Cameron had a motive to murder his mom. From this, the jury could have reasonably concluded that he simply did not hear the single shotgun blast that took his mom's life, rather than finding this circumstance suspect. *See Austin v. State*, 222 S.W.3d 801, 807 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (lack of evidence showing an apparent motive can render evidence that otherwise could support a finding of guilt less persuasive in a particular instance).

* * *

Considering the cumulative force of all the evidence that the jury heard about Wallace's death, and viewing the evidence in the light most favorable to the jury's verdict, as we must, the jury could have reasonably found beyond a reasonable doubt that Haberland was the person who murdered Wallace. In so holding, in addition to

28

his motive, we emphasize the role that evidence of Haberland exhibiting consciousness of his guilt doubtless played in the jury's verdict—his implausible statements to officers, his statements that were inconsistent with the evidence, his unannounced departure from the scene under false pretenses, his avoidance of officers afterward and false identification of himself, and his disposal of evidence. *See Brown v. State*, 618 S.W.3d 352, 358 (Tex. Crim. App. 2021) (indicating that in "a murder case where we know someone killed the victim," prosecution "can use consciousness-of-guilt evidence to show it was the defendant" who did so).

## CONCLUSION

We hold that the evidence is legally sufficient to support the jury's finding that Haberland murdered Wallace, even though the evidence is circumstantial. *See Ingerson*, 559 S.W.3d at 509 ("Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence."); *Whatley v. State*, 445 S.W.3d 159, 167 (Tex. Crim. App. 2014) (holding jury could have found accused guilty beyond reasonable doubt based on aggregate of possible inferences it could have drawn from evidence even though each individual inference alone may not have sufficed). We therefore affirm the trial court's judgment of conviction.

Jennifer Caughey
Justice

Panel consists of Justices Guerra, Caughey, and Dokupil.

Do not publish. TEX. R. APP. P. 47.2(b).